## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

SANTIAGO P.,                                    :
                                                :
                    Petitioner,                 :          Civ. No. 20-5067 (KM)
                                                :
          v.                                    :
                                                :
THOMAS DECKER, *et al.*,                        :          **OPINION**
                                                :
                    Respondents.                :
_____        :

### KEVIN MCNULTY, U.S.D.J.

### I.      INTRODUCTION

Petitioner, Santiago P.,[1] is an immigration detainee currently held at the Hudson County Correctional Facility, in Kearny, New Jersey. He is proceeding by way of counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DE 1.) Petitioner seeks immediate release from custody or, in the alternative, injunctive relief. (*Id.* at 19.) Respondents oppose the petition. (DE 11.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the petition will be granted insofar as it seeks a preliminary injunction requiring Petitioner's temporary release. This decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case.

_____

[1]      Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

## II.   BACKGROUND

### A.   COVID-19

The United States is currently in the midst of a pandemic caused by an infectious disease known as COVID-19. *See* Ctrs. for Disease Control and Prevention, *Situation Summary*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last visited May 14, 2020). COVID-19 is a respiratory disease which is thought to spread "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html   (last visited May 14, 2020). Even individuals who are asymptomatic may be able to spread the virus. *See id.* The disease is spreading "very easily and sustainably between people." *See id.* Within the United States to date, over 1,360,000 people have tested positive for COVID-19 and over 82,000 individuals have died as a result. *See* Ctrs. for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 14, 2020).

Common symptoms of COVID-19 include a fever, cough, and shortness of breath. *See* Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 14, 2020). The Centers for Disease Control and Prevention ("CDC") has identified certain groups of individuals who are deemed to be at "higher risk for severe illness" if they contract COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

(last visited May 14, 2020). These high risk individuals include, but are not limited to, those who are over 65 years of age, have asthma, or are immunocompromised. *See id.*

In order to prevent the spread of the virus, the CDC recommends "social distancing" (staying at least six feet away from others), wearing cloth face coverings when in public, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *See* Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/disinfecting-your-home.html (last visited May 14, 2020). Obviously, however, "[t]he best way to prevent illness is to avoid being exposed to this virus." *See id.*

## B.      Background

### i.      Procedural History

Petitioner is a 52-year-old native and citizen of the Dominican Republic. (DE 11-9 at 4.) On October 25, 1993, Petitioner was admitted into the United States as a lawful permanent ("LPR"). (*Id.*) In 2000, he pleaded guilty to driving without a license, in violation of New York State Vehicle and Traffic Law § 509.1. (DE 1-6 at 4.) He was sentenced to 15 days' incarceration and a $50.00 fine. (*Id.*) Petitioner also pleaded guilty in 2000 to attempted criminal sale of a controlled substance in the third degree, in violation of New York Penal Law § 110-220.39 01. (*Id.*) He was sentenced to nine months' incarceration and his license was suspended for six months. (DE 1-6 at 4.)

On December 20, 2000, Petitioner was removed from the United States under an alias. (DE 11-3 at 4.) In July 2007, he was admitted into the United States as a returning LPR under his real name. (*Id.*) It was not until June 2016 that United States Citizenship and Immigration Services ("USCIS") discovered that Petitioner had previously been removed under an alias. (*Id.*)

In 2019, Petitioner pleaded guilty to conspiracy to distribute and possession with intent to distribute 40 grams or more of Fentanyl, in violation of 21 U.S.C. § 846. (DE 11-1.) He was sentenced to two years in prison and 60 months of supervised release. (*Id.*) On September 3, 2019, Petitioner was released from the Federal Bureau of Prisons and placed into the custody of Immigration and Customs Enforcement ("ICE"). (DE 11 at 7; DE 1-6 at 1.) He was served with a Notice to Appear charging him with removability and placing him in removal proceedings. (DE 11-9.) Petitioner has remained detained at Hudson County Correctional Facility ("HCCF") pursuant to ICE's mandatory pre-removal detention under 8 U.S.C. § 1226(c). (DE 11 at 7; DE 1-6 at 1.)

On April 24, 2020, Petitioner filed this habeas petition pursuant to 28 U.S.C. § 2241. (DE 1.) He seeks release from custody based upon alleged unconstitutional conditions of confinement and inadequate medical care. (*Id.* at 19.) On April 29, 2020, Respondents filed opposition to the petition. (DE 7.) Petitioner thereafter filed a reply, as well as a supplemental exhibit. (DE 13; DE 14; DE 20.)

ii.     *Petitioner's Health*

Petitioner submits, and his medical records confirm, that he suffers from asthma, diabetes, major depressive disorder, dyspnea, and obesity. (DE 4 at 7; DE 14 at 2.) Petitioner's medical records indicate that he is permitted to keep his inhaler with him in his cell. (DE 14 at 47, 62.) Petitioner reports needing to use his inhaler often, sometimes several times within an hour. (*Id.* at 2.) Indeed, Petitioner's medical records reveal that he has complained of asthma symptoms on numerous occasions and he has been seen frequently by medical staff for his condition. (*See generally* DE 14.)

Petitioner's records also indicate that he had lab work done in December 2019 which revealed that he was diabetic. (*Id.* at 69.) However, Petitioner was not informed of this diagnosis until April 2020. (*Id.*) On April 14, 2020, Petitioner was prescribed medication for his diabetes, placed on a special diet, and instructed as to the treatment and management of his condition. (*Id.*)

In support of the severity of his medical conditions, Petitioner provides the declaration of Dr. Robert Greifinger who reviewed Petitioner's declaration, as well as his medical records. (DE 13-2.) Dr. Greifinger confirms that Petitioner has moderate asthma and diabetes, which place him at higher risk for serious complications if he contracts COVID-19. (*Id.* at 2.) Dr. Greifinger also states that the failure of HCCF to inform Petitioner of his diabetes diagnosis for several months, "falls far below the standard of correctional health care." (*Id.*) Dr. Greifinger avers that, based upon Petitioner's medical conditions, "the only way to protect [Petitioner] from serious harm or death is to release him from detention so he may practice social isolation and heightened hygiene." (*Id.* at 3.)

## C.    Conditions at HCCF

### i.    *Respondents' Evidence Regarding the Conditions at HCCF*

To describe the measures HCCF has implemented to combat the spread of COVID-19, Respondents provide the declaration of Ron Edwards, the Director of the Hudson County Department of Corrections and Rehabilitation.[2] (DE 20-1.) Mr. Edwards states that since March 2020, HCCF has taken various measures to ensure the health and safety of detainees during the COVID-19 outbreak. (*Id.* at 3.) Each housing unit is now on a "Restrictive Schedule" which only permits detainees outside of their cells for two 30-minute periods per day. (*Id.*) These 30-minute

---

[2]    At the time Respondents filed their brief, they provided the Fourth Amended Declaration of Mr. Edwards. (DE 11-7.) The court has now received Mr. Edwards' updated Fifth Amended Declaration. (DE 20-1.)

recreation periods have been staggered so that only two detainees are permitted to leave their cell area at a time, in order to allow room for social distancing. (*Id.* at 7.) Detainees "do not mingle during recreation time." (*Id.*)  The recreation areas are being "cleaned continuously during a 16-hour period during the day." (*Id.* at 3–4.) Housing units are sanitized no less than three times per day. (*Id.* at 4.) Detainees are provided with two bars of soap each, but additional soap is available upon request. (*Id.* at 9.) Detainees also have unlimited access to water and are provided with disinfectant wipes. (*Id.*) All detainees have also been provided with surgical masks, and all staff have been provided with Personal Protective Equipment. (*Id.* at 7, 11.)

HCCF has suspended all tours, volunteer services, visitation. (*Id.* at 5–6.) Any facility, staff members, or vendors coming into HCCF must have their temperatures screened by a medical professional prior to entering the facility. (*Id.* at 5.) Anyone running a temperature of over 100 degrees Fahrenheit is not permitted to enter. (*Id.*) Staff and detainees have also been advised on best practices to prevent the spread of COVID-19, including the importance of hand washing. (*Id.*) HCCF has posted CDC and Department of Health posters with this information throughout the facility. (*Id.*)

HCCF has established a designated housing unit as a quarantine area for detainees who are suspected of having, or who have tested positive for, COVID-19. (*Id.* at 6.) Medical personnel are visiting each cell twice a day to check on every detainees' medical and mental health. (*Id.* at 7.) Meals are provided to detainees within their cells so that they do not congregate for meal time. (*Id.* at 8.) HCCF staff are encouraging inmates and detainees to avoid congregating. (*Id.* at 8.)

HCCF is following guidance issued by the CDC and World Health Organization ("WHO"), as well as local guidelines, on testing and treatment for COVID-19. (*Id.* at 8.) Detainees who exhibit symptoms consistent with COVID-19 are evaluated "immediately" and any detainee who

feels symptoms can make daily sick calls as needed. (*Id.*) A detainee may make a sick call "via tablet or to a nurse that comes in the unit twice a day." (*Id.*)

If a detainee tests positive for COVID-19, but does not require hospitalization, he will be isolated in a designated isolation area with other individuals who have tested positive. (*Id.*) Detainees' vitals are monitored on a daily basis and they are evaluated for hospital placement. (*Id.* at 8–9.) Detainees who are symptomatic and awaiting test results are placed in quarantine, where they remain for 14 days. (*Id.* at 9.) Individuals who are asymptomatic but have been exposed to someone with confirmed COVID-19, are housed together in a practice referred to as "cohorting." (*Id.* at 9.) If, after fourteen days, no new cases develop, cohorting is discontinued. (*Id.*) Any detainees with health conditions identified by the CDC as placing them at higher risk of developing serious illness of COVID-19 are being housed separately. (*Id.* at 11.)

As of 1:00 p.m. on May 4, 2020, 13 detainees have tested positive for COVID-19; 27 county and federal inmates have tested positive; and 94 staff members have tested positive. (*Id.* at 14.) Tragically, one member of the HCCF correctional staff, the former facilities commissary director, and two nurses who worked at HCCF have all died from complications of COVID-19. (*Id.*) HCCF has tested 88 inmates and detainees for COVID-19. (*Id.* at 10.) Of those 88, 40 have tested positive, and 38 have made a full recovery. (*Id.*) None of those individuals were hospitalized. (*Id.*) Approximately 150 HCCF law enforcement officers have been tested for COVID-19. (*Id.*) Ninety-four of them have tested positive, and 81 have recovered and returned to duty. (*Id.*)

ii.    *Petitioner's Evidence Regarding the Conditions at HCCF*

Petitioner has provided his own declaration describing conditions at HCCF, as well as the declaration of his attorney, with whom he has spoken with over the phone and via videoconferencing on multiple occasions. (DE 13-3; DE 1-6.) Petitioner states that he currently

shares a cell with another individual, in a "mixed unit of those who do and do not have medical conditions." (DE 13-3 at 2–3.) His cell is not cleaned. (*Id.* at 2.) If Petitioner wants to clean his cell, he must do so on his own by requesting a mop that is shared by "everyone in the jail," as well as a "small amount of spray." (*Id.*)

Petitioner states that in March, he had difficulty accessing soap to wash his hands. (*Id.*) Recently, however, Petitioner has been provided a "limited" amount of soap, which he uses to wash his body, hands, and clothes. (*Id.*) He states he is able to request more soap "about once a week." (*Id.*) He has not been provided with any hand sanitizer. (*Id.*)

Petitioner is permitted to leave his cell for two hours each day, one hour in the morning and one hour in the afternoon. (*Id.*) He has been provided with a face mask, but most detainees do not wear their masks when they are outside of their cells. (*Id.*) Petitioner states that the "common spaces where there are phones are like a pigsty." (*Id.*) He has not been provided with anything to clean or disinfect the phones before he uses them. (*Id.*) There are two showers available for detainees to use, but Petitioner contends they are "dirty" and "only cleaned monthly." (*Id.*) He states that "there is no place in the jail where everyone can safely remain six feet apart." (*Id.*)

As further evidence of the conditions at HCCF, Petitioner also provides the declarations of attorneys at The Bronx Defenders, The Legal Aid Society, and the American Civil Liberties Union of New Jersey. (DE 1-3; DE 1-5; DE 1-7.)[3]  These declarations indicate that individuals detained at HCCF are having difficulty accessing prompt medical attention, personal hygiene products, disinfectant, and cleaning supplies. (DE 1-3 at 3–4; DE 1-5 at 2–3.) The declarations also suggest that detainees are unable to adhere to CDC guidelines such as social distancing, hand washing, and

---

[3]      To the extent that these declarations contain hearsay, a court may consider hearsay evidence at the preliminary injunction stage. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004). I do so in recognition of the communication difficulties and the impracticality of having prisoners appear in person.

cleaning of high touch surfaces. (DE 1-3 at 3–4; DE 1-5 at 4.) Petitioner also submits the declaration of an attorney at the Health Justice Program at New York Lawyers to the Public Interest. (DE 1-4.) The attorney delineates the problems that inmates and detainees have had accessing medical care at HCCF in the past. (*Id.*)

### III.    JURISDICTION

Generally, conditions of confinement claims are brought pursuant to 8 U.S.C. § 1983. *See Camacho Lopez v. Lowe*, Civ. No. 20-563, 2020 WL 1689874, at *4–5 (M.D. Pa. Apr. 7, 2020). However, where an individual seeks "immediate or more speedy release," he is asserting a remedy available through a habeas petition. *See Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973). A habeas petition is the process by which an individual may challenge the "fact or length" of his confinement. *See id.* To date, the United States Supreme Court has not expressly stated whether a conditions of confinement claim may be raised through a habeas corpus petition. *See Ziglar v. Abbasi*,  137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [individuals] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). However, federal courts of appeals appear to have condoned such challenges. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Moreover, recent caselaw within this circuit has been largely consistent in finding that an immigration detainee may challenge the conditions of his confinement through a

§ 2241 petition. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases). Given these considerations, I agree with the line of cases that have permitted conditions of confinement claims to proceed through a habeas petition and find that Petitioner may pursue his claims through the present petition.[4]

## IV.   LEGAL STANDARD

The relief Petitioner seeks is his release from custody. (DE 1 at 19.) At this time, I will analyze Petitioner's request under the standard for a preliminary injunction. *See Hope v. Warden York Cty. Prison*, Civ. No. 20-1784, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020); *Ousman D. v. Decker*, Civ. No. 20-2292, 2020 WL 1847704, at *4 (D.N.J. Apr. 13, 2020). In order to obtain a preliminary injunction, a petitioner must provide a "threshold" showing of two critical factors: (1) a likelihood of success on the merits of his claim; and (2) that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). If these two "gateway factors" are met,

---

[4]      I also note that under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that this custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek § 2241 relief only in the district in which he is in custody. *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). Thus, this Court has jurisdiction over Petitioner's claims as he is detained within this district and alleges that his detention violates the Constitution.

then the Court considers the remaining two factors which aim to balance the equities of the parties: "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." *Id.* at 176 (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The Court considers, "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

## V.   DISCUSSION

Petitioner raises a single cause of action in his petition—that Respondents' conduct has violated his substantive due process rights under the Fifth and Fourteenth Amendments. (DE 1 at 18–19.) Petitioner's argument arises under two separate theories: first, that his detention during the COVID-19 pandemic has entailed unconstitutional conditions of confinement; and second, that Respondents' failure to address his specific medical vulnerabilities during the pandemic constitutes inadequate medical care. (*Id.* at 22–32.) Based upon the particular circumstances presented, I find that Petitioner has met the standard for a preliminary injunction.

### A.   Likelihood of Success on the Merits

#### i.   *Conditions of Confinement Claim*

Petitioner argues that detaining a medically vulnerable person, such as himself, in the midst of a life-threatening pandemic is tantamount to punishment. (DE 4 at 22.) The conditions at HCCF, he says, are "highly dangerous" because of the virulence of the COVID-19 outbreak and the failure of HCCF to provide adequate protection. (*Id.* at 25.) As an example, he cites his inability to practice social distancing and access basic hygiene products such as soap and disinfectant wipes. (*Id.*) Respondents contend, however, that the facility has undertaken numerous measures to combat the spread of COVID-19, and that Petitioner's health conditions do not overcome the government's legitimate interest in his continued detention. (DE 11 at 18–19.)

An immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth Amendment. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the "same due process protections" as pretrial detainees). Under the Fifth Amendment's Due Process Clause, "a detainee may not be punished prior to an adjudication of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). In order to determine whether a challenged condition amounts to punishment, a court looks at whether that condition "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Whether a condition of confinement is reasonably related to a legitimate government objective turns on whether the condition serves a legitimate purpose and is rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A petitioner can demonstrate that a challenged condition amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," *or* if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

In the emerging case law that has developed within this district, courts have emphasized certain key factors in determining whether an immigration detainee's conditions of confinement amount to punishment during the current pandemic: namely, the detainee's health and the specific conditions at the facility at which he is detained. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020)*; Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384,

at *8 (M.D. Pa. Apr. 27, 2020); *Rafael L.O. v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843, at *7-8 (D.N.J. Apr. 9, 2020). In the absence of guidance from the Supreme Court or the Courts of Appeals regarding how to handle conditions of confinement claims during a pandemic, "many courts have found that insufficient jail action in light of the virus can serve as a basis for release . . . while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted." *Cristian R. v. Decker*, Civ. No. 19-20861, 2020 WL 2029336, at *2 (D.N.J. Apr. 28, 2020).

Here, Petitioner's medical records reveal that he has multiple health conditions which have been recognized by the CDC as placing him at higher risk of severe illness if he contracts COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 14, 2020) (listing moderate to severe asthma and diabetes as placing people at higher risk for severe illness from COVID-19). Not only was Petitioner recently diagnosed with diabetes, but his medical records indicate that he has needed to be seen by medical staff on numerous occasions for his asthma. (*See generally* DE 14.)

Additionally, the evidence submitted by Petitioner indicates that he is unable to adhere to the measures "touted [by the CDC] as the most effective means to thwart the spread of the virus." *Rafael L.O. v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843, at *8 (D.N.J. Apr. 9, 2020). He indicates that he is unable to practice social distancing, unable to access sufficient hygiene products, and unable to disinfect commonly touched surfaces throughout the facility. (DE 13-3.) Further, although HCCF indicates that high risk inmates (including those with moderate to severe asthma and diabetes) are housed separately, Petitioner indicates that he is being housed in a "mixed unit" with both individuals who are at higher risk of contracting COVID-19 and those who are not.

(*Compare* DE 20-1 at 11, *with* DE 13-3 at 3.) Although representatives of HCCF have presented substantial evidence of great efforts to prevent the spread of COVID-19, the fact remains that there have been a significant number of cases among the staff and inmates. The evidence submitted by Petitioner indicates that despite the best intentions and efforts of HCCF, issues may still persist. It is not necessary to resolve factual disputes, however, because my decision will rest primarily on Petitioner's medical condition, and the high danger of serious illness or death in his particular case if the measures should fail to protect him from infection.

I do not find that Respondents have an intent to punish Petitioner. However, it seems that the danger to this particular Petitioner remains great. There is currently no cure or vaccine for COVID-19; preventive measures are the only option. *See* Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 14, 2020). Unfortunately, Petitioner appears unable to adhere to these measures. And, more fundamentally, however highly we might rate HCCF's efforts, a large number of COVID infections have nevertheless emerged, including four fatal cases among the staff.

Thus, while I recognize that the government has a legitimate objective in preventing Petitioner from absconding, enforcing immigration laws, and protecting the public, Petitioner's present circumstances are excessive in relation to the purpose of his detention. *See Bell*, 441 U.S. at 538; *see also Thakker v. Doll*, Civ. No. 20-480, 2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020) (finding that government's legitimate interest in detaining petitioners was deeply weakened in light of the COVID-19 pandemic and medical vulnerabilities of petitioners). This is especially true given the other alternatives available to ICE to achieve their objectives. *See Thakker*, 2020 WL 1671563, at *8 ("We note that ICE has a plethora of means *other than* physical detention at

their disposal by which they may monitor civil detainees and ensure that they are present at removal proceedings, including remote monitoring and routine check-ins." (emphasis in original)). This is also consistent with findings by other courts within this district that appropriate conditions of release can be adequate to address Respondents' interests. *See Thakker*, 2020 WL 2025384, *9– 12 (releasing petitioners with convictions for simple assault, drug-related offenses, and theft- related offenses subject to conditions); *Rafael L.O. v. Tsoukaris*, 2020 WL 1808843, at *1, 9 (releasing three petitioners with convictions or pending charges of felony drug offenses, criminal sexual contact, and assault subject to strict conditions of confinement); *see Anthony W. v. Anderson*, Civ. No. 20-3704, 2020 WL 2121118, at *11 (D.N.J. Apr. 17, 2020) (releasing petitioner with drug related felony conviction subject to stringent conditions). Accordingly, I find that Petitioner has shown a likelihood of success on the merits of his conditions of confinement claim.

### ii.    *Inadequate Medical Care Claim*

Petitioner's second due process claim arises from his argument that Respondents have failed to take adequate steps to protect him from COVID-19. (DE 4 at 28–32.) He states that "[g]iven the likelihood of transmission within the facility, ICE simply cannot detain someone who is medically vulnerable during the COVID-19 pandemic without disregarding a substantial, known, and obvious risk of serious medical harm or death." (*Id.* at 32.) Conversely, Respondents argue the numerous measures they have implemented in order to combat the spread of COVID-19 demonstrates that they have not acted with deliberate indifference towards the risk that the infection poses. (DE 11 at 19–20.)

The applicable legal standard for an immigration detainee's inadequate medical care claim is that of deliberate indifference. *See Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008)

15

(citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)); *see also Camacho Lopez v. Lowe*, Civ. No. 3:20-CV-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020). Thus, to succeed on a claim of inadequate medical care, a petitioner must show: (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582. The Supreme Court has held that an official demonstrates deliberate indifference where "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This standard requires that the official was "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official actually drew that inference. *See Natale*, 318 F.3d at 582.

Here, Respondents actions do not exhibit deliberate indifference. HCCF has implemented extensive measures in response to the current pandemic. (DE 20-1.) They have attempted to follow CDC and WHO guidance, increased cleaning of their facility, provided staff and detainees with face masks, and enacted measures to encourage social distancing. (*Id.*) Although there may not yet be a perfect solution to prevent the spread of this infectious disease, HCCF is continuously updating their protocols and attempting to implement measures to stop the spread of the disease. Accordingly, I do not find that Petitioner has demonstrated a likelihood of success on the merits of this claim.[5]

---

[5]    In his reply, Petitioner appears to also argue that HCCF failed to promptly diagnose and treat his diabetes, which he contends evinces a deliberate indifference to his serious medical needs. (DE 13 at 13–14.) Petitioner provides the declaration of Dr. Greifinger which states that this delay in treatment "falls far below the standard of correctional healthcare." (DE 13-2 at 2.)

    Within the context of an inadequate medical care claim, the Third Circuit has identified several circumstances that constitute deliberate indifference, including: "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2017) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)); *see also Natale*, 318 F.3d at 582. "A mere 'inadvertent failure to provide adequate medical care'—*i.e.*, negligent diagnosis or treatment—will not create an Eighth Amendment claim." *South v. New Jersey Dep't of Corr.*,

Nevertheless, while Petitioner has not shown a likelihood of success on the merits of his deliberate indifference claim, he has still demonstrated a likelihood of success on his conditions of confinement claim.  Therefore, I find that Petitioner has met the first factor required for the grant of a preliminary injunction.

## B.     Irreparable Harm

The second threshold showing Petitioner must make in order to be granted a preliminary injunction is that he is "more likely than not" to suffer irreparable harm absent the relief requested. *See Reilly*, 858 F.3d at 179. Respondents argue that in light of the protective measures enacted at HCCF, Petitioner is unable to demonstrate irreparable harm. (DE 11 at 24.) However, as described more fully above, Petitioner has established that despite HCCF's protocols, he remains unable to adhere to social distancing guidelines or practice an adequate level of personal hygiene. (DE 13-3.)  Although there is currently no guarantee against contracting COVID-19, correctional and detention facilities present "unique challenges for control of COVID-19 transmission[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilies*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 14, 2020). Within facilities such as HCCF, detainees "cannot practically adhere to social distancing guidelines or the adequate level of personal

---

Civ. No. 17-13387, 2018 WL 5630593, at *5 (D.N.J. Oct. 31, 2018) (quoting *Estelle*, 429 U.S. at 105–06)).

    Here, however, Petitioner has not provided sufficient information to demonstrate that HCCF intentionally refused to provide *necessary* medical treatment, prevented Petitioner from receiving *necessary* care, or delayed Petitioner's treatment in such a way as to exacerbate his medical condition. HCCF did eventually inform Petitioner of his diabetes diagnosis, prescribe him medication, and place him on a special diet. Thus, even if this was a lapse, I fail to see the connection to Petitioner's claim that he must be released going forward.

    To the extent this argument is related to his claim that HCCF has failed to adequately protect him from COVID-19, then, Petitioner is unable to demonstrate a likelihood of success on the merits of his habeas petition.

hygiene," measures which have been "touted as the most effective means to thwart the spread of the virus." *See Cristian A.R. v. Decker*, Civ. No. 20-3600, 2020 WL 2092616, at *12 (quoting *Rafael L.O.*, 2020 WL 1808843, at *8). The continuing rise in the number of cases at HCCF underscore this point. Moreover, given Petitioner's underlying health conditions, he is especially at risk of developing severe illness. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 14, 2020). Against this backdrop, it is apparent that Petitioner has demonstrated irreparable harm if his confinement at HCCC continues.

## C.     Balancing of the Equities

Finally, I consider the remaining two factors that aim to balance the equities of the parties: the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. For the reasons explained above, the possibility of harm to Petitioner, given his medical vulnerability, is unacceptably high. Moreover, the public interest also supports Petitioner's release before he contracts COVID-19 in order to "preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems." *See Cristian A.R.*, 2020 WL 2092616, at *13.

I do find, however, that Respondents have a legitimate interest in ensuring Petitioner does abscond and that he does not commit any offenses while on release. Although Petitioner does have prior criminal convictions, they are nonviolent in nature. Petitioner indicates that, if released, he will be able to reside with a family member in Massachusetts, where the outbreak is less severe. The probation office for the District of Massachusetts has already performed a background check and confirmed that the family member is suitable. (DE 13 at 16–17; DE 13-5.) Given these considerations, I believe that Respondents' and Petitioner's concerns can be appropriately

balanced by releasing Petitioner to strict conditions including home confinement and electronic and telephonic monitoring. The specific conditions of his release are set forth in the Order accompanying this Opinion.[6] Thus, in balancing the equities, I find that they favor the grant of a preliminary injunction.

## VI.    CONCLUSION

For the foregoing reasons, the petition (DE 1) will be granted insofar as a preliminary injunction shall be issued. An appropriate Order accompanies this Opinion.


DATED: May 14, 2020


                                                    /s/ Kevin McNulty
                                            _____
                                            KEVIN MCNULTY
                                            United States District Judge

---

[6]    Respondents' answer requests the opportunity to suggest conditions of release if the Court is inclined to grant such release. (DE 11 at 25.) Petitioner will be released on the conditions outlined in the accompanying Order. If modification is sought, counsel should attempt to agree, but if there is no such consent, the court will entertain letter applications for modification of conditions of release.